ROWLEY UNITED PENSION FUND, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9011-73.    Filed May 29, 1975.

*Claude R. Wilson, Jr.,* for the petitioner.
*Robert M. Smith,* for the respondent.

WILBUR, *Judge:* Respondent has determined a deficiency of $535,411.72 in petitioner's Federal income tax for the taxable year ending August 31, 1970. Due to concessions by the parties the only issue remaining for decision is whether the petitioner received taxable rental income from property subject to business lease indebtedness during the taxable year in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated by reference.

The petitioner is a trust which at the time of filing the petition had its principal place of business in Dallas, Tex. Petitioner is an organization exempt from tax pursuant to section 501(a) for the taxable year ended August 31, 1970. Petitioner filed its exempt organization business income tax return for the taxable year ended August 31, 1970, with the District Director of Internal Revenue at Dallas, Tex.

On December 19, 1953, petitioner leased land located in San Angelo, Tex., to the General Telephone Co. of the Southwest (hereinafter General). Petitioner acquired the land for the purpose of building a consolidated home office building for General, which then had their principal offices located in Dallas and other offices scattered around the country. Pursuant to the terms of the lease, the petitioner constructed a building on this land which was occupied by General on November 21, 1954.

At the time the original lease was executed in 1953 both the petitioner and General contemplated that it would be necessary to construct additions to the original building. The 1953 lease provided that if, at any time after the expiration of the 10th lease

year, General desired to have the petitioner erect any major addition or additions to the building located on the leased premises, General would request the petitioner to construct or cause to be constructed such addition or additions. General's request was to be in writing and to describe the nature of the addition with particularity. Thus, under the terms of the lease, General had the right to request the construction of additions to the building at any time after December 1, 1964. The lease also provided that if the petitioner elected not to construct such addition or additions, General would have the option to purchase the land and existing building by payment of the original cost of the building less 1 percent for each year during which General had occupied the property.

The 1953 lease further provided that any time after 15 years from the date of possession of the leased premises by General, General had the option to purchase the leased premises on the last day of any lease year thereafter upon written notice 6 months prior to the end of the lease year. The option price was the original cost as defined by the lease less 1 percent of such original cost for each year during which General occupied the property.

In early 1963 General needed additional space and, therefore, requested that petitioner build an additional building in advance of the period provided for in the lease. In deciding whether to build the addition petitioner considered two factors. First, the price at which petitioner would be required to sell the building to General was substantially less than the value of the property. Second, if petitioner did not build the addition, General might decide to move out of the facility upon expiration of the initial term of the lease in 1974. Petitioner would then own a special purpose building which, in their opinion, could not be leased on an economically viable basis to other tenants in a town the size of San Angelo (population approximately 58,000). The petitioner also felt obligated, if not legally at least morally, to build the facility for General.

In April 1964 petitioner and General executed a supplementary agreement (the 1964 agreement) which provided for construction by General of an addition to the leased property and a subsequent sale of the addition to the petitioner. The agreement included a new lease, the term (a basic 20-year term, renewable for two periods of 10 years each) of which would begin on the first day of the calendar month following the date of settlement. The new

lease provided for increased rent based on the cost of constructing the addition. The date of settlement was March 10, 1966, the date on which the petitioner purchased the addition from General.

Both the construction of the original building and the purchase of the addition were debt-financed. As of August 31, 1970, the petitioner had unpaid indebtedness incurred in acquiring or improving the property of $262,922.29 for the original building and $1,535,102.11 for the addition. As of August 31, 1970, the petitioner's adjusted basis in the original building was $710,868.50 and in the addition was $1,653,584.08. The petitioner's adjusted basis in the land and other assets on which depreciation is not claimed is $17,831.

The rental income for the taxable year 1970 from the original building was $101,651.95. Interest expense of $13,188.76 and depreciation of $21,575.03 were allocable to the original building.

The rental income from the addition for the taxable year 1970 was $183,680.46. Interest expense of $86,253.44 and depreciation of $35,688.45 were allocable to the addition.

The petitioner does not receive separate tax assessments or insurance bills for the original building and the addition. The petitioner determined both the taxes and the insurance expense attributable to each structure by allocating the amount paid on the original building prior to the construction of the addition to the original building and allocating the balance to the addition. The total insurance expense for the taxable year 1970 was $1,410, and the total taxes were $58,937.75. Both the original building and the addition were subject to business leases.

OPINION

In 1954, Congress acted to eliminate what they considered to be the unfair advantage accruing to tax-exempt stock bonus, profit-sharing, and pension trusts [1] engaging in business activities in competition with taxable corporations.[2] Section 511(b) [3] of the 1954 Code subjected employee trusts to the unrelated business income tax provisions of the Internal Revenue Code. Those

---

[1] Hereinafter these trusts will be referred to collectively as employee trusts.

[2] H. Rept. No. 1337, to accompany H.R. 8300 (Pub.L. No. 591), 83d Cong., 2d Sess. 45 (1954).

[3] Unless otherwise indicated all section references are to the Internal Revenue Code of 1954.

provisions, which tax income unrelated to an organization's exempt purpose, were added to the Code in 1950 to eliminate advantages organizations exempt from taxation had previously enjoyed over their taxpaying competitors.[4] Unrelated business income is defined to include income from property subject to a business lease to the extent that debt is incurred to finance the acquisition or improvement of the property.[5]

Since employee trusts were first taxed on income from property subject to business lease indebtedness in 1954, Congress sought to prevent hardship which would result from application of the provisions to indebtedness which was a product of obligations fixed before March 1, 1954.[6] Section 514(g)(5)[7] was designed to ease the transition to taxation by providing relief for those trusts which had, prior to March 1, 1954, either incurred indebtedness in connection with leased property or executed a lease whose terms would require the trust to incur indebtedness after that date.

All indebtedness incurred in connection with property leased prior to March 1, 1954, was excluded from the definition of business lease indebtedness. Indebtedness incurred after March 1,

---

[4] Sec. 301, Revenue Act of 1950, 64 Stat. 947. See H. Rept. No. 2319, to accompany H.R. 8920 (Pub. L. No. 814), 81st Cong., 2d Sess. 36-40 (1950).

[5] See secs. 513, 512(a)(1), 512(b)(4).

[6] S. Rept. No. 1622, to accompany H.R. 8300 (Pub.L. No. 591), 83d Cong., 2d Sess. 57 (1954).

[7] Sec. 514(c) was relettered sec. 514(g) by the Tax Reform Act of 1969, Pub.L. 91-172, 83 Stat. 548. For convenience, reference is made to the provisions as relettered.

Sec. 514(g) reads in pertinent part:

SEC. 514. UNRELATED DEBT-FINANCED INCOME.

(g) BUSINESS LEASE INDEBTEDNESS.—

(1) GENERAL RULE.—The term "business lease indebtedness" means, with respect to any real property leased for a term of more than 5 years, the unpaid amount of—

(A) the indebtedness incurred by the lessor in acquiring or improving such property;

(B) the indebtedness incurred before the acquisition or improvement of such property if such indebtedness would not have been incurred but for such acquisition or improvement; and

(C) the indebtedness incurred after the acquisition or improvement of such property if such indebtedness would not have been incurred but for such acquisition or improvement and the incurrence of such indebtedness was reasonably foreseeable at the time of such acquisition or improvement.

* * *

(5) CERTAIN TRUSTS DESCRIBED IN SECTION 401(a).—In the case of a trust described in section 401(a), or in the case of a corporation described in section 501(c)(2) all of the stock of which was acquired prior to March 1, 1954, by a trust described in section 401(a), any indebtedness incurred by such trust or such corporation before March 1, 1954, in connection with real property which is leased before March 1, 1954, and any indebtedness incurred by such trust or such corporation on or after such date necessary to carry out the terms of such lease, shall not be considered as an indebtedness with respect to such trust or such corporation for purposes of this subsection.

1954, was, on the other hand, excluded from the definition only if it was necessary to carry out the terms of a lease executed on or before March 1, 1954.

Respondent has conceded on brief that the basic lease executed on December 19, 1953, qualifies as a lease of real property prior to March 1, 1954. Respondent contends, however, that the 1964 agreement was a new lease, covering both the original building and the addition. Since neither of these buildings continued to be leased pursuant to the pre-March 1, 1954, lease, the income from both buildings, in respondent's view, is subject to the unrelated business income tax. Alternatively, respondent argues that even if income from the original building continues to be exempt under section 514(g)(5), the addition was not constructed pursuant to the basic lease and was not "necessary to carry out the terms" of the basic lease since section 514(g)(5) contemplated legal compulsion and not economic necessity.

Conversely, petitioner contends that the 1964 agreement was simply an amendment to the basic lease, and that in any event the issue is whether the addition was "necessary to carry out the terms" of the basic lease, regardless of the legal format for accommodating the necessity. Petitioner contends that the term "necessity" contemplates the "economic necessity" of avoiding a loss.

Since we believe the original building and the addition call for different treatment, we first direct our attention to the original building. Respondent concedes that the indebtedness incurred to construct the original building was within the exception provided by section 514(g)(5) for the first 10 years after it was constructed. Respondent, however, concludes that this indebtedness—although excluded from treatment as business lease indebtedness when incurred—loses this exemption merely because the building was subsequently leased to the same tenant pursuant to a different lease. In this respondent errs, for the 1954 legislation contemplates that the exemption is retained throughout the term of the debt.[8] If a tenant moves out or goes bankrupt after 1954, the employee trust can rent the property to a new tenant without the indebtedness being transformed into business lease indebtedness. Respondent cites no authority for his

---

[8] See, however, secs. 514(c)(1) and 514(g)(1) and (5) reflecting the changes made by Congress in the Tax Reform Act of 1969, Pub.L. 91-172, 83 Stat. 548, for taxable years beginning after Dec. 31, 1971.

contention that the original building loses its exemption when the 1964 agreement was signed, and his position has no basis in the statutory language.

Consequently, the only indebtedness which can qualify as business lease indebtedness is that incurred in connection with the addition. We must, therefore, determine whether the indebtedness incurred in connection with the construction of the addition was "necessary to carry out the terms" of the basic lease within the meaning of section 514(g)(5). We conclude that it was not.

Section 514(g)(5) exempts:

any indebtedness incurred * * * before March 1, 1954, in connection with real property which is leased before March 1, 1954, and any indebtedness incurred by such trust * * * on or after such date necessary to carry out the terms of such lease * * *

The Senate Finance Committee, which added the above language to the House bill, indicated the situation they had in mind:

if a lease was made before March 1, 1954, and indebtedness incurred on or after such date to construct a factory required for such lease, such indebtedness would not be treated as business lease indebtedness. [S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 313 (1954).]

Congress intended to exempt an employee trust from the new provision when *specified* real property (i.e., a factory) had *already been leased* (although the property was under construction or to be constructed) on the assumption the rent from the property would be tax free. Applying the new rules to such a transaction would have retroactively upset the assumptions on which the trust had invested, or become contractually obligated to invest, in specified buildings; would have invalidated cost recovery projections already made and the adequacy of rent already agreed to; and might have turned a transaction that was profitable when the contract was executed into a significant loss.

Although the specified property must have already been leased, property that was under construction (or on which construction was soon to commence) in accordance with the specifications in the lease, qualified for the exemption in view of the concrete commitments the trust made on the assumption the rent would be tax-exempt. This explains the statement of the Finance Committee above quoted that where a trust has agreed to lease real property, including a factory it was "required" to construct

under the lease, the indebtedness incurred to construct the property qualifies for the exemption.

We do not believe the addition that was designed and constructed in 1964 qualifies for this exemption. Petitioner did not lease the addition prior to March 1, 1954, and had no obligation to construct the addition on that date. No investment had been made, no rent agreed to, no cost-recovery or rate-of-return projections determined with respect to the addition that would have been invalidated by the new law. Neither the language of section 514(g)(5) nor its underlying purpose encompasses petitioner's circumstances.

It is true that nearly a decade after the original lease, General decided it would need some additional space. But any obligation petitioner had prior to March 1, 1954, was contingent on both the time and scope of any request General might ultimately make. When the request was made, a lease for a different term, involving different rents, a new loan, and different property (as contemplated by the basic lease) was agreed upon.

Whether the 1964 agreement is characterized as a new lease or an amendment to the basic lease is not particularly important, since we do not believe the possibility that petitioner might, at some unknown future date, be called upon to erect some kind of a building, and lease it for a period and rental to be agreed upon (subject to certain minimums spelled out in the basic lease) is the kind of preexisting commitment Congress contemplated in enacting section 514(g)(5).[9]

The 1950 legislation taxing unrelated business income was a broadly remedial statute expressive of strong congressional concern.[10] If we construed the exception in section 514(g)(5) to

---

[9] It is true that petitioner would have been required, if it did not construct the addition, to sell the original building to General at a formula price that turned out in 1964 to be less than its value. However, it would have been difficult in 1954 to predict that the formula price would be detrimental to petitioners, and in fact, it does *not* appear to have been designed to penalize petitioner. Thus, the basic lease gave General the right in any event to purchase the original building at any time after 15 years from the date of possession pursuant to a formula price identical to that used to compute the option price applicable if petitioner declined to build an addition as requested by General.

[10] Congress, in enacting the predecessor of sec. 514, was concerned that exempt organizations were in effect "trading" on their exemptions, selling their exemption in a highly leveraged transaction pursuant to terms tax-paying organizations could not meet. Congress felt that in view of the leverage provided by tax-exemption, these investments were "not * * * limited by the funds available for investment on the part of the exempt institution." Expressing concern about unfair competitive erosion of the tax base, Congress said that "particular attention should be given to lease-backs which involve the use of borrowed funds." H. Rept. No. 2319, 81st Cong., 2d Sess. 38, 39 (1950). See *Chamber of Commerce*

be as broad as petitioner asserts, it would leave the applicability of the remedial provisions subject to events that might occur far into the future. If Congress intended such a result, we believe they would have clearly spelled it out.

We have concluded that the original building qualifies for the exception in section 514(g)(5), while the addition does not. Therefore, it is necessary to properly allocate the rental income and deductible expenses between the exempt and nonexempt properties. We believe the allocation of rental on petitioner's books reflects the agreement reached by petitioner and General and that this record provides no basis for improving on the allocation made. The respondent agrees with the interest and depreciation ascribed by petitioner between the original building and the addition.[11] The parties have agreed to the basis and remaining loan indebtedness for the original building and also for the addition.

In order to reflect concessions made by the parties,

*Decision will be entered under Rule 155.*

---

*of Kansas City, Kansas,* 35 T.C. 562, 565 (1961).

[11] The respondent disagrees with the allocation petitioners made for taxes and insurance (for which there is not separate assessment or bill) between the old and new building. If the parties are unable to agree on these items in submitting their Rule 155 computation, the Court will make supplemental findings on these items.