ELLIOT KNITWEAR PROFIT SHARING PLAN, LOUIS M. LEMPKE, TRUSTEE BY HERMAN GROSS, SUBSTITUTE TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2725–77.     Filed February 12, 1979.

*J. Earl Epstein* and *Barry M. Harvis,* for the petitioner.
*Marc A. Feller,* for the respondent.

### OPINION

TIETJENS, *Judge:* Respondent has determined a deficiency in petitioner's Federal income tax for the taxable year ending April 30, 1972, in the amount of $20,719. The issue is whether income from securities purchased on margin by a qualified profit sharing plan is subject to the tax imposed by section 511 on unrelated business income.

This case was fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioner Herman Gross is the trustee of Elliot Knitwear Profit Sharing Plan. He is the successor to Louis M. Lempke,

who resigned as trustee of the plan on December 12, 1974. The parties have failed to stipulate the trustee's residence for purposes of appellate venue, and we make no finding of residence.

During the taxable year ending April 30, 1972, Elliot Knitwear Profit Sharing Plan (hereafter the plan) was a profit sharing plan and trust qualified under section 401(a) and thus exempt from Federal income tax under section 501(a). Adopted on October 22, 1959, the plan was created and sustained by Elliot Knitwear Corp. and its successor, Elliot International, Inc., and was funded primarily by employer contributions. Employer contributions were paid out of the employer's annual net profits in such an amount as the employer determined in its sole discretion. Although employees were permitted to contribute to the plan, their contributions were limited to a maximum of 10 percent of their individual compensation for the taxable year. The amount and source of such contributions are not in issue here, and we therefore make no finding thereon. In any event, all trust income and corpus were used or accumulated only for the exclusive benefit of the employees or their beneficiaries. In this regard, we note that the benefits payable to the employees depended upon the profitability of the trustee's investment of trust corpus as well as employer contributions.

The trust agreement authorized the trustee to borrow money, pledge securities as collateral, and purchase securities on margin. During the taxable year at issue petitioner did in fact purchase and sell securities on margin. The amounts of the purchases, sales, and borrowings are not in dispute. The only controversy is over the tax consequences resulting from those purchases.

Respondent contends that the income from the securities purchased on margin is taxable under section 511. His argument focuses on section 514. He argues that the securities are debt-financed property within the meaning of section 514(b)(1); as such, the income from the securities is unrelated debt-financed income under section 514(a) and thus is taxable as unrelated business income under section 511(b). Respondent concedes that except as provided by section 514, the income from the securities does not constitute unrelated business income here. Petitioner contends that the securities are not debt-financed property within the meaning of section 514(b)(1). Specifically, he argues,

the indebtedness incurred in purchasing the securities is not an acquisition indebtedness because "the purchase of securities 'on margin' by a profit sharing trust is inherent in the exercise of its exempt function." He also argues that the purchase of securities by a qualified profit sharing plan is substantially related to the exercise or performance by the plan of its exempt function; thus, under section 514(b)(1)(A)(i), the securities are excepted from the definition of debt-financed property.

Section 511(b) imposes a tax on the unrelated business taxable income of certain tax-exempt trusts. Unrelated business taxable income is defined generally to mean gross income derived by any organization from any unrelated trade or business regularly carried on by it, less deductions which are directly connected with the carrying on of such trade or business. Sec. 512(a)(1). In the case of a trust described in section 401(a), an unrelated trade or business is any trade or business regularly carried on by the trust. Sec. 513(b)(2). In addition, section 514(a) provides generally that income earned on "debt-financed property" shall be treated as income derived from an unrelated trade or business. To the extent that the income is so treated, it is subject to the tax imposed by section 511. See secs. 514(a) and 512(a).

In defining "debt-financed property," section 514(b)(1) provides in pertinent part:

(b) DEFINITION OF DEBT-FINANCED PROPERTY.—

(1) IN GENERAL.—For purposes of this section, the term "debt-financed property" means any property which is held to produce income and with respect to which there is an acquisition indebtedness (as defined in subsection (c)) at any time during the taxable year (or, if the property was disposed of during the taxable year, with respect to which there was an acquisition indebtedness at any time during the 12-month period ending with the date of such disposition), except that such term does not include—

(A)(i) any property substantially all the use of which is substantially related (aside from the need of the organization for income or funds) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 * * * , or (ii) any property to which clause (i) does not apply, to the extent that its use is so substantially related;

Petitioner first contends that the securities do not fall within the above definition of debt-financed property because the margin account is not an acquisition indebtedness as defined in subsection (c). In this regard, petitioner relies only on subsection (c)(4).

Section 514(c)(4) provides:

(4) INDEBTEDNESS INCURRED IN PERFORMING EXEMPT PURPOSE.—For purposes of this section, the term "acquisition indebtedness" does not include indebtedness the incurrence of which is inherent in the performance or exercise of the purpose or function constituting the basis of the organization's exemption, such as the indebtedness incurred by a credit union described in section 501(c)(14) in accepting deposits from its members.

Thus, where it is essential for an exempt organization to incur debt in order to perform its exempt function, the indebtedness is not treated as an acquisition indebtedness. The example cited above of a credit union incurring indebtedness by accepting deposits from its members is clearly distinguishable from the indebtedness incurred by a profit sharing plan that buys securities on margin. In order to get deposits, a credit union must necessarily incur indebtedness to its depositors. In order to accumulate funds, however, it is not necessary for a profit sharing plan to buy securities on margin. Although the indebtedness may affect the plan's return on investment, a return would still be realized and the plan\would still function without the debt. Thus, we do not consider this type of indebtedness to be inherent in the exercise of petitioner's exempt function.

The result might be different with respect to any indebtedness incurred in accepting employer or employee contributions. Cf. sec. 1.514(c)–1(d), Income Tax Regs. A plan cannot function at all without such contributions. But, again, a qualified plan can and often does perform its exempt function without incurring other types of debt. Thus, in our opinion, the distinction lies in the essential, as opposed to the useful, nature of the indebtedness.

Petitioner also argues, however, that because the plan's trust agreement authorized the trustee to purchase securities on margin, and because respondent has granted petitioner an exemption based on that trust agreement, respondent is prevented from arguing that the use of a margin account is not inherent in the performance of the exempt function. Respondent objects that this argument is an attempt to raise the defense of estoppel without any affirmative pleading to that effect. Clearly, if the argument is an attempt to raise estoppel, it is barred under Rule 39, Tax Court Rules of Practice and Procedure. It was never affirmatively pleaded and therefore

cannot be raised on brief. See also *Groetzinger v. Commissioner*, 69 T.C. 309, 312 (1977).

In any event, a finding that the incurrence of indebtedness is inherent in the performance of petitioner's exempt function is not required for respondent also to determine petitioner's qualification for exemption. See sec. 401(a); Rev. Rul. 71–311, 1971–2 C.B. 184. Section 511 is designed to impose a tax on organizations, such as petitioner, that respondent determined otherwise to be exempt. It is not designed as a separate set of requirements to be met before tax exemption can be granted. Thus, we consider petitioner's argument in this regard to be inapposite.

Petitioner also contends that the securities are excluded from the definition of debt-financed property by section 514(b)(1)(A)(i). He thus argues that the securities are property the use of which is substantially related to the exercise or performance by the plan of its exempt purpose or function. In this regard, he argues, the purpose or function of a qualified profit sharing plan includes the acquisition of securities and the accumulation of income and gains. Respondent argues, however, that the purpose or function of such plans is deferred compensation, and that the buying and selling of income producing property is merely a means to accomplish that purpose or function.

With respect to the parties' respective arguments about the purpose or function of the plan, we can find support for both arguments in the regulations. See secs. 1.401–1(a)(3)(iii) and 1.401–1(b)(1)(i), Income Tax Regs. Although a profit sharing plan is primarily a plan of deferred compensation, the investment and reinvestment of employer (and employee) contributions may be considered as one of its functions. Nevertheless, by its very terms, section 514(b)(1)(A)(i) does not exclude property such as petitioner's securities from the definition of debt-financed property.

Again, section 514(b)(1)(A)(i) excludes:

(A)(i) any property substantially all the use of which is substantially related (*aside from the need of the organization for income or funds*) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 * * * [Emphasis supplied.]

Quite clearly, the section was not intended to exclude income

producing property held only to produce income. The mere application of income or funds earned on income producing property to the exempt purpose or function is not a substantially related use for purposes of the above exception. The property itself, not the income derived from the property, must be used by the organization in the exercise or performance of its exempt purpose or function.

Nevertheless, petitioner argues that because the plan's exempt purpose or function includes the acquisition of securities and the accumulation of income, the property itself is being used in the exercise or performance of that purpose or function. Although petitioner's argument is, on the surface, persuasive, we reject it.

Prior to its amendment in 1969, section 514 generally treated, as unrelated business income, rental income from real property leased for more than 5 years to the extent that it was subject to a business lease indebtedness. The section was designed to prevent, among other things, the trading in real estate by an exempt organization on its exemption. See H. Rept. 2319, 81st Cong., 2d Sess. 38–39 (1950), 1950–2 C.B. 380, 410. Thus, the amount of rental income attributable to the borrowed funds used to finance the purchase of the rental property was taxable. This restricted the tax to income that did not result from a simple investment of the organization's capital funds and eliminated the possibility that the organization would use its exemption alone to acquire the property. H. Rept. 2319, *supra* at 39–40, 1950–2 C.B. at 411.

Initially, the provision applied only to a select group of tax-exempt organizations. H. Rept. 2319, *supra* at 36–39, 1950–2 C.B. at 408–411. After 1954, however, the tax on debt-financed business leases clearly applied to qualified profit sharing plans, too. H. Rept. 91–413 (Part 1), 91st Cong., 1st Sess. 46–47 (1969), 1969–3 C.B. 200, 230; S. Rept. 91–552, 91st Cong., 1st Sess. 67 (1969), 1969–3 C.B. 423, 467. See S. Rept. 1622, 83d Cong., 2d Sess. 313 (1954); *Rowley United Pension Fund v. Commissioner*, 64 T.C. 343 (1975). See also sec. 1.514(g)–1(f), Income Tax Regs. And when Congress amended section 514 in 1969, it neither expressly nor impliedly intended to exclude qualified profit sharing plans from the section's application. See H. Rept. 91–413 (Part 1), *supra* at 44–47, 1969–3 C.B. at 228–230; S. Rept. 91–552, *supra* at 62–68, 1969–3 C.B. at 464–467. Rather, the amendments

simply broadened the section's scope to apply to all income producing property subject to acquisition indebtedness instead of business leases alone.

In this regard, we note the similarity between the exception to the definition of debt-financed property, on which petitioner relies, and the exception to the definition of a business lease prior to 1969, which, as already suggested, did not exclude business leases held by qualified plans.[2] The differences are minor, reflecting an intent to broaden, not narrow, the types of property that are taxable under section 514. Yet, if we read the current exception to debt-financed property as petitioner suggests it should be read for qualified profit sharing plans, then even the business lease would be excepted when, prior to 1969, it clearly was not. This would be a strained interpretation indeed. We find it impossible in the case of a qualified profit sharing plan to draw a distinction between rental property and all other income producing property, and we see no justification in the statute for doing so.[3]

*Decision will be entered for the respondent.*

---

[2]Prior to 1969, sec. 514(b)(3)(A) provided:

(3) EXCEPTIONS.—

(A) No lease shall be considered a business lease if—

(i) such lease is entered into primarily for purposes which are substantially related (aside from the need of such organization for income or funds or the use it makes of the rents derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501, or

(ii) the lease is of premises in a building primarily designed for occupancy, and occupied, by the organization.

After 1969, sec. 514(b)(1)(A) excludes:

(A)(i) any property substantially all the use of which is substantially related (aside from the need of the organization for income or funds) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 * * * , or (ii) any property to which clause (i) does not apply, to the extent that its use is so substantially related;

[3]We recognize that different considerations may apply in the case of an employee stock ownership plan. Cf. sec. 4975(d)(3); sec. 54.4975–7(b)(5), Excise Tax Regs.; Summary of the Tax Reform Act of 1976, Joint Comm. on Taxation, 94th Cong., 2d Sess. 30–33 (1976), 1976–3 C.B. (Vol. 1) 454–457. See generally J. Kaplan & W. Cowan (ERISA) — "Employee Stock Ownership Plans — Qualification," 317 T.M. Portfolio 21–22 (1977). We therefore express no opinion on whether such plans may be taxable under sec. 514.