**ELLIOT KNITWEAR PROFIT SHARING PLAN, Louis M. Lempke, Trustee by Herman Gross, Substitute Trustee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Elliot Knitwear Profit Sharing Plan, Appellant.**

No. 79–1965.

United States Court of Appeals, Third Circuit.

Argued Jan. 9, 1980.

Decided Jan. 28, 1980.

J. Earl Epstein, Barry M. Harvis, Epstein, Beller & Shapiro, Philadelphia, Pa., for appellant.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Robert A. Bernstein, Gayle P. Miller, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before GIBBONS, ROSENN and GARTH, Circuit Judges.

OPINION OF THE COURT

GIBBONS, Circuit Judge.

The taxpayer, Elliot Knitwear Profit Sharing Plan (the Plan), appeals from a judgment entered in favor of the Commissioner of Internal Revenue on its petition contesting a claimed deficiency in income tax in the amount of $20,719.00. The Plan alleges that this claimed deficiency resulted from the erroneous inclusion in its taxable income by the Commissioner of income realized by the purchase and sale of securities on margin. The Tax Court determined that such securities purchased on margin were debt-financed property within the meaning of section 514(b)(1) of the Internal Revenue Code (Code), and that the income therefrom was therefore subject to taxation as unre-

lated business income under section 511 of the Code.[1] We affirm.

## I

The parties have stipulated to the relevant facts. On October 22, 1959, Elliot Knitwear Corporation, employer, adopted the Elliot Knitwear Profit Sharing Plan and Trust, taxpayer. During the fiscal year ending April 30, 1972, the taxable year in question, the Commissioner had determined that the Plan qualified under section 401(a) of the Code and was therefore exempt from federal income taxation under section 501(a).[2]

Employees contributed to the Plan to a limited extent. The Plan was funded primarily by employer contributions that were paid out of net profits in such amounts as the employer determined in its sole discretion. The trust agreement authorized the trustee, *inter alia*, to borrow money, pledge securities as collateral, and purchase securities on margin.

During the fiscal year, the Plan purchased securities on margin for the purpose of increasing the funds that eventually would be available for distribution to employees. For such purchases, the Plan incurred indebtedness with respect to their acquisition. The Plan realized substantial income from these transactions and contends that this income is not taxable.

The question presented on this appeal is whether securities purchased on margin by a tax-exempt employee profit-sharing plan constitute debt-financed property, such that profits derived from the sale thereof are taxable as unrelated business income.

1. *See* 26 U.S.C. §§ 511, 514 (1976).

2. *See* 26 U.S.C. §§ 401(a), 501(a) (1976).

3. Section 511(b) reads as follows:
   (b) Tax on charitable, etc., trusts—
   (1) Imposition of tax.—There is hereby imposed for each taxable year on the unrelated business taxable income of every trust described in paragraph (2) a tax computed as provided in section 1(e). In making such computation for purposes of this section, the term "taxable income" as used in section 1

## II

There is no dispute that the Plan is tax-exempt under sections 401(a) and 501(a). Section 511(b) imposes a tax on the unrelated business taxable income of tax-exempt trusts.[3]

Unrelated business taxable income is defined to mean "the gross income derived by any organization from any unrelated trade or business . . . regularly carried on by it, less deductions . . . which are directly connected with the carrying on of such trade of business . . . ." 26 U.S.C. § 512(a)(1).

An unrelated trade or business in the context of a trust under section 401(a) means any trade or business regularly carried on by such a trust, the conduct of which is not substantially related to its tax-exempt purpose. 26 U.S.C. § 513(b)(2). Income earned on debt-financed property is treated as income derived from an unrelated trade or business, 26 U.S.C. § 514(a), and as such is taxable under section 511. *See* 26 U.S.C. § 511.

Taxpayer contends that securities purchased on margin are not within the statutory definition of debt-financed property. Section 514(b)(1) sets forth the definition, providing in relevant part:

   (b) Definition of Debt-Financed Property.—

   (1) In general.—For purposes of this section, the term "debt-financed property" means any property which is held to produce income and with respect to which there is an *acquisition indebtedness* (as defined in subsection (c)) at any time

shall be read as "unrelated business taxable income" as defined in section 512.
   (2) Charitable, etc., trusts subject to tax.—The tax imposed by paragraph (1) shall apply in the case of any trust which is exempt, except as provided in this part or part II (relating to private foundations), from taxation under this subtitle by reason of section 501(a) and which if it were not for such exemption, would be subject to subchapter J (sec. 641 and following, relating to estates, trusts, beneficiaries, and decedents).
26 U.S.C. § 511(b) (1976).

during the taxable year . . . except that such term does not include—

(A)(i) any property substantially all the use of which is substantially related (aside from the need of the organization for income or funds) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 . . ., or (ii) any property to which clause (i) does not apply, to the extent that its use is so substantially related . . . .

26 U.S.C. § 514(b) (emphasis added).

The Plan's first argument is that the margin account is not an acquisition indebtedness as defined in section 514(c)(4). Section 514(c)(4) provides:

(4) Indebtedness incurred in performing exempt purpose.—For purposes of this section, the term "acquisition indebtedness" does not include indebtedness the incurrence of which is *inherent* in the performance or exercise of the purpose or function constituting the basis of the organization's exemption, such as the indebtedness incurred by a credit union described in section 501(c)(14) in accepting deposits from its members.

26 U.S.C. § 514(c)(4) (emphasis added).

The starting point for analysis under this section must be a determination of the purpose of the Plan's exemption. We must then give meaningful content to the word "inherent."

The Plan argues that its exempt purpose is to accumulate income for the employees, and that therefore its purpose includes the investment of funds. The fact that the Plan was granted exempt status by the Commissioner, and that the Plan authorized the purchase of securities on margin, does not lead to the conclusion that such purchases are the exempt purpose or are even inherent in the exempt purpose. The mere grant of tax-exempt status cannot be understood to render any subsequent borrowing by the exempt organization a part of that organization's exempt purpose. This would greatly undermine the statute and render it virtually meaningless because the unrelated business income tax applies only to exempt organizations.[4]

Moreover, the Commissioner's approval of a Plan that authorizes purchases on margin cannot act as a waiver on the part of the Commissioner with respect to that specific income. The recognition of a tax-exempt function under section 401 does not require an inquiry into whether acquisition indebtedness is inherent in the performance of that function. Section 511 involves an entirely different set of standards that must be met on organization.

The exempt purpose of a profit-sharing plan is to provide for employee participation in the profits of the employer.[5] Investment of the employer's contribution for the additional accumulation of income and gains is certainly a desirable function of a profit-sharing plan. However, such a purpose may be accomplished without borrowing and is not essential to the existence of such a plan. The tax exemption granted under sections 401 or 501(a) allows the income derived from investments (not involving funds borrowed for acquisition) to be exempted from income taxes. Thus the tax-exempt status of an organization is not nullified by a tax on debt-financed income.

The parties have vigorously debated the meaning of "inherent" as used in section 514(c)(4). The Plan contends that the Tax Court erred by defining inherent to mean essential. If inherent is so defined, it is immediately apparent that indebtedness is not essential or inherent to the Plan.

"Inherent" is defined as "involved in the constitution or essential character of something"[6] and "essential" refers to "of, relating to, or constituting essence; inherent."[7]

---

4.  *See* 26 U.S.C. § 511(a)(2).

5.  *See* 26 C.F.R. §§ 1.401–1(a)(2)(ii), (1)(b)(1)(ii) (1979).

6.  Webster's New Collegiate Dictionary 593 (1976).

7.  *Id.* at 391.

Regarding these two words as virtual synonyms is certainly not clear error as the Plan suggests. Taxpayer's view that inherent is used in the statute to encompass more activities than are necessarily essential to the Plan, is not supported by the statutory example of a credit union.[8] It is essential for a credit union to incur indebtedness; it must be indebted to its depositors to function at all. With a profit-sharing plan, on the other hand, while investment of the fund probably is inherent to its tax-exempt purpose, debt-financed investment is not. It will still function as intended. Certainly, a fiduciary would not be surcharged for refraining from engaging in debt-financed market speculation.

Thus, given the possible synonymous usage of inherent and essential, and the statutory example, we are persuaded to hold that the purchase of securities on margin is not inherent to the purpose of a tax-exempt profit-sharing plan within the meaning of section 514(c)(4).

The Plan's next contention is that these purchases fall within the exception to the definition of debt-financed property under section 514(b)(1)(A)(i). Thus, property where substantially all its use is substantially related to the organization's purpose, is not within the section 514 definition even when "acquisition indebtedness" is present. It is the property itself, not the income generated by the property, that must be substantially related to the exempt purpose of the organization.

Again, the Plan argues that the purpose of a qualified profit-sharing plan includes the accumulation of income and gains through investment in securities. Since the Code treats profit-sharing plans and their tax-exempt status under "subchapter D–Deferred Compensation, Etc.", it is reasonable to conclude that the primary purpose of such a plan is deferred compensation.[9] The regulations refer to such plans as primarily

a way for "an employer to provide for the participation in his profits by his employees. . . ."[10] It is expected that the buying and selling of income-producing property will be a method utilized to increase and accumulate income and gains, but such investment activity is a means to accomplish the purpose of deferred compensation—it is not the purpose itself of the Plan. Even assuming, arguendo, that investment of contributions for accumulation of income is a function of the Plan, indebtedness or acquisition of securities on margin is not necessary for such accumulation or that purpose.

On a textual basis, the statute does not exclude property that is substantially related by virtue of "the need of the organization for income or funds . . . ." 26 U.S.C. § 514(b)(1)(A)(i). The Plan's properties in this instance are related to its purpose of accumulation of funds, and were purchased *because* of the need for additional income. Thus the language alone appears to indicate that the securities purchased on margin are not excluded under the definition of debt-financed property.

The legislative history also supports a literal reading of the statute. It is true, as taxpayer states, that the primary objective of Congress in enacting the unrelated business tax "was to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the non-exempt business endeavors with which they compete."[11] The purchase of securities on margin does not seem to present a great opportunity for this type of potential abuse. However, a more in-depth look at the progressive changes in section 514 gives a better picture of the legislative intent.

The Tax Court correctly noted that section 514 was designed to prevent, *inter alia*, an exempt organization from trading in

---

8. *See* 26 U.S.C. § 514(c)(4).

9. *See* 26 U.S.C. §§ 401–483 (1976).

10. 26 C.F.R. § 1.401–1(b)(1)(ii) (1979); *see* 26 C.F.R. § 1.401–1(a)(2)(ii) (1979).

11. 26 C.F.R. § 1–513–1(b) (1979).

real estate on its exemption.[12] A tax was imposed upon rental income derived from borrowed funds that were used to finance the purchase of the rental property. Correspondingly, no tax was imposed on income attributable to the investment of the exempt organization's capital funds. Thus, prior to its amendment in 1969, section 514 imposed a tax on unrelated business rental income from real property (leased for more than five years) to the extent it resulted from a business lease indebtedness.[13]

After 1954, this tax on debt-financed leases was made applicable to profit-sharing plans.[14] There is no indication that when Congress amended section 514 in 1969, qualified profit-sharing plans were intended to be excluded. These amendments broadened the scope of the statute beyond business leases in order that it be applicable to all income that resulted from property subject to acquisition indebtedness. We agree with the Tax Court, that if the exception to section 514 that the taxpayer urges was accepted, business leases would also have to be excepted.[15] Obviously, such a result would change the interpretation of the statute as it existed prior to 1969. The amendments did not intend this change. Thus the language of the statute itself and the relevant legislative history support the Tax Court's holding that the acquisition of securities on margin is not within the "substantially related" exception under section 514(b)(1)(A)(i).

We hold that securities purchased on margin by a tax-exempt employee profit-sharing plan constitute debt-financed property and that the income derived from such property is taxable as unrelated business income.

### III
The decision of the Tax Court will be affirmed in all respects.

---

12. *See* H.R.Rep.No. 2319, 81st Cong., 2d Sess. 38–39 (1950).

13. Prior to 1969, section 514(b)(3)(A) provided:
(3) Exceptions.—
(A) No lease shall be considered a business lease if
(i) such lease is entered into primarily for purposes which are substantially related (aside from the need of such organization for income or funds or the use it makes or the rents derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501, or

(ii) the lease is of premises in a building primarily designed for occupancy, and occupied, by the organization.

14. H.R.Rep.No. 91–413, 91st Cong., 1st Sess. 46–47 (1969); S.Rep.No. 91–552, 91st Cong., 1st Sess. 67 (1969), [1969] U.S.Code Cong. & Ad.News, p. 1645; *see, e. g., Rowley United Pension Fund v. Commissioner,* 64 T.C. 343, 346 (1975).

15. We do not find the distinctions between the two types of property, as suggested by the Plan, to be persuasive.